UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re: Raymond C. Slade,

                                                    Case No. 08-10927-j7

                Debtor.

CAGO, INC.,

                Plaintiff,

        v.                                          Adversary No. 08-01065-j7

RAYMOND C. SLADE.

                Defendant.

## <u>MEMORANDUM OPINION</u>

This matter is before the Court on the Complaint Objecting to Discharge[1] filed by

CAGO, Inc. ("CAGO" or "Plaintiff"), through its counsel of record, Jason C. Bousliman[2],

against Raymond Curtis Slade ("Mr. Slade" or "Defendant"). [3] Mr. Slade is a debtor under

Chapter 7 of title 11 of the United States Code. CAGO seeks a non-dischargeable judgment

---

[1] The Plaintiff originally made claims under 11 U.S.C. § 727 "Discharge," but those claims were not included in the Consolidated Pretrial Order. The Debtor's general discharge is therefore not affected by this decision, pursuant to Fed. R. Civ. P. 16, made applicable in this case by Fed.R.Bankr.P. 7016.

[2] Mr. Bousliman, who has been CAGO's primary counsel throughout this litigation, began his representation as a member of Modrall, Sperling, Roehl, Harris & Sisk PA, but, while the case was pending, left that firm and joined Lewis and Roca LLP. Spencer Lewis Edelman (of Modrall, Sperling, Roehl, Harris & Sisk PA) entered his formal appearance on behalf of the Plaintiff on March 1, 2010, but was not present at the trial.

[3] Mr. Slade appeared *pro se* at the trial, but was represented by attorney Russell C. Lowe until the Court granted Mr. Lowe's Motion to Withdrawal as Attorney, which was conditioned on Mr. Lowe's continued representation of Mr. Slade through the entry and explanation of a pretrial trial order (*see* Docket No. 47, entered May 19, 2011). The pretrial order was entered on September 6, 2011 (Docket No. 63). An Order Authorizing and Allowing Withdrawal of Counsel Russell C. Lowe as Defendant's Attorney was entered September 8, 2011 (Docket No. 65).

against Mr. Slade under §§ 523(a)(2)(A) and (B), 523(a)(4), 523(a)(6), and 523(a)(11) of the Bankruptcy Code. [4] *See* Consolidated Pretrial Order (Docket No. 63).

The Court held a trial on the merits on October 17 and 18, 2011. After considering the evidence, arguments of counsel and applicable statutory and case law, the Court has determined that CAGO established a claim of a non-dischargeable debt under 11 U.S.C. §§ 523(a)(2)(A), and will enter a judgment on that claim. The Court denies all other claims of a non-dischargeable debt.

**Jurisdiction and Venue**

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(a) and (b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(J). Venue is proper under 28 U.S.C § 1409(a). Pursuant to Rule 52, Fed.R.Civ.P., made applicable by Rule 7052, Fed.R.Bankr.P., the Court now states its findings of fact and conclusions of law.

## FINDINGS OF FACTS

This is a case about a missing trackhoe.

Mr. Slade is the 100% owner of Stoneworks, LLC, a New Mexico limited liability company ("Stoneworks"). In late 2005, CAGO, on the one hand, and Stoneworks, Mr. Slade, individually, and Mr. Slade "dba Stoneworks," on the other, entered into an "Equipment Lease Agreement with Option to Purchase" (the "Contract") for a Link Belt model 4300 Quantum Excavator (the "Trackhoe" or "Equipment").[5] Neither Stoneworks nor Mr. Slade made any of the payments required under the Contract, and were in default from the day Stoneworks took possession of the Trackhoe. In mid-2007, the parties entered into a settlement agreement to resolve issues relating

---

[4] All references to "§[]" hereinafter refer to 11 U.S.C. §[§]. Title 11 of the U.S. Code shall also be referred to as the "Bankruptcy Code" or the "Code".

[5] There is no evidence before the Court that Stoneworks at any material time was a sole proprietorship. Mr. Slade apparently was added as a lessee under the Contract as an accommodation party.

this non-performance (the "Settlement Agreement"). Again, no payments – other than those paid by a third party – were made. Mr. Slade filed a Chapter 7 bankruptcy case on March 28, 2008, Case No. 08-10927. The Trackhoe disappeared in April 2008; both parties deny knowledge of its disposition or whereabouts. Each has insinuated that the other took it. CAGO filed the Complaint in this adversary proceeding on May 15, 2008. In September 2008, a Texas grand jury indicted Mr. Slade for theft of services in excess of $200,000 in connection with his obligations under the Contract. In December 2010, Mr. Slade entered into a plea agreement whereby he agreed to pay CAGO restitution of $125,000, in addition to $75,000 that he paid immediately after the plea agreement was made. The Court now examines these events in greater detail.

### The Parties Meet and Form the Contract

The parties met at some time in 2003 or 2004, well before they formed the Contract. Robert F. Bourk ("Mr. Bourk") is the President of CAGO. He conducted or directed all actions attributable to CAGO in this case. At the time he met Mr. Slade, Mr. Bourk had been acting as the President of CAGO for approximately thirty years. Mr. Bourk was a practicing attorney for approximately twenty-five years in Oklahoma City, Oklahoma. His law practice concentrated in the areas of collection law and civil litigation. Mr. Bourk was introduced to Mr. Slade by a friend who was Mr. Slade's criminal defense attorney in unrelated matters at that time. Amongst others, Mr. Slade had been charged with bribery of a federal government official, a fact of which Mr. Bourk was aware and into which he later performed some investigation prior to entering into the Contract.[6]

---

[6] Around the time of this introduction, Mr. Slade was operating another company, which was then engaged in a demolition project at a building located in downtown Albuquerque. Mr. Bourk was interested in acquiring a piece of property in or around Albuquerque and inspected the building to see if it suited his purposes for a future

Mr. Slade eventually chartered Stoneworks, which conducted a gravel mining operation. The gravel mining operation took place on land owned by Ronald E. Douglass and JoAnn C. Douglass, located in the greater Albuquerque area (the "gravel pit"). Stoneworks operated the gravel pit property under a mining lease (the "Douglass Mining Lease").

The channel of communication between Mr. Slade and Mr. Bourk remained open after their initial introduction. In August 2005, Mr. Slade sought to obtain a trackhoe from Mr. Bourk. Mr. Slade testified that he "was trying to buy it, more than anything." Mr. Bourk, being aware of Mr. Slade's criminal history, performed due diligence on Mr. Slade. He spoke with Robert Finch, a Chapter 7 case trustee in an unrelated bankruptcy case in which Mr. Slade was seeking recovery of construction equipment. Mr. Finch gave Mr. Bourk a favorable recommendation for Mr. Slade, telling Mr. Bourk that he, the trustee, was familiar with the case in which Mr. Slade was charged with bribery of a government official, that Mr. Slade had received a "bad deal," and that the trustee felt like most of the problems in some of Mr. Slade's previous business dealings were not Mr. Slade's fault. Mr. Bourk also consulted two or three other attorneys who were familiar with Mr. Slade.

On November 11, 2005, CAGO and Mr. Slade executed the Contract. The Contract provided for the rental of the Trackhoe by CAGO to Stoneworks for a one-year term commencing on November 14, 2005. Slade or Stoneworks was to pay CAGO $72,000 in twelve equal monthly rental payments ($6,000 a month). Any payment more than ten days late was subject to a $500.00 late fee. A security deposit of $6,000 was required to be paid prior to commencement of the lease term. As additional security, the Contract provided for a security interest in Slade's leasehold interest in the Douglass Mining Lease. The Contract also contained a purchase option

---

investment vehicle. He determined that it was not. Mr. Slade's company was at some point stripped of this demolition job when a worker died by falling from the building's roof. That company folded.

for $70,000 less any payments already made, conditioned upon Mr. Slade and/or Stoneworks being current on the payments. CAGO filed a financing statement on the Trackhoe under the New Mexico Uniform Commercial Code.

### Performance Under the Contract and the 2007 Settlement Agreement

Neither Stoneworks nor Mr. Slade ever made any of the rental payments required under the Contract, nor was the required security deposit ever made. As such, the Contract was in default from the day the Trackhoe was delivered. Mr. Slade represented to Mr. Bourk that Stoneworks was waiting on payment for accounts receivable to raise funds to make the security deposit, and that, although he had other debts awaiting payment, Mr. Slade held unencumbered property and thus had alternative avenues through which to make the security deposit. Mr. Slade further represented to CAGO that Stoneworks would have the means to make the rent payments. CAGO allowed Stoneworks to take possession of the Trackhoe despite its failure to make the security deposit at the time of delivery as required by the Contract, because of Mr. Slade's representations that he would nevertheless eventually perform under the Contract.

Mr. Bourk engaged in a substantial amount of communication with Mr. Slade and other Stoneworks employees throughout 2006. Janet Hoshor,[7] who was managing secretary of Stoneworks during much of its time in operation, was present for the initial delivery of the Trackhoe. She also helped Mr. Bourk obtain the information needed to file a UCC financing statement. Ms. Hoshor testified that she spoke with either Mr. Bourk or his wife once or twice a month by telephone while she was employed at Stoneworks. During their many conversations regarding Stoneworks' non-performance under the Contract, she repeatedly offered the Trackhoe back to Mr. Bourk. Mr. Bourk also spoke with Mr. Slade on the telephone frequently during this time period. During these conversations, Mr. Slade made continuing representations of his

---

[7] Ms. Hoshor's name at the time of her employment by Stoneworks was Janet Heirshberg.

Case 08-01065-j    Doc 77    Filed 03/15/12    Entered 03/15/12 11:45:24 Page 5 of 33

intentions and Stoneworks' abilities to make the rental payments.  Mr. Bourk elected not to retake possession of the Trackhoe.  He testified that he preferred to receive the past due rent instead of retaking possession of the Trackhoe.[8]

Mr. Bourk made multiple personal trips to the gravel pit.  Mr. Bourk was never denied access to any information he sought to the extent information was available, nor was Mr. Bourk ever denied access to the gravel pit.  Stonework's business records were in a state of disarray, a fact of which Mr. Bourk was aware.

As time went on and while these events built upon one another, Mr. Bourk sought to work out a deal where he would be paid moneys owed by Mr. Slade.  During one of his numerous visits, on or about September 12, 2006, Stoneworks tendered four post-dated checks to CAGO, one for $20,000 and three for $15,000 each.[9]  Mr. Bourk had reason to believe when the checks were tendered that there were insufficient funds in the bank account where they were drawn to honor the checks.  Mr. Bourk sought to deposit two of the checks; they were returned for insufficient funds.  He did not deposit the other two.

These specific events surrounding the Trackhoe unfolded against a backdrop fraught with business and legal difficulties.  Stoneworks was financially unstable from the beginning, and a great deal of self-described financial "improv" took place; *e.g,*. many truckers were paid in gravel and trading goods for debt was a common practice.  Stoneworks' debts and problems reached an insurmountable level when the New Mexico Department of Transportation ("NMDOT") executed a search warrant on the property via a SWAT team raid in late 2006. NMDOT Officer Stan Lundy, who directed the raid, testified that he had talked with a number of

---

[8] There was conflicting testimony regarding whether Mr. Bourk refused to retake possession of the Trackhoe because his true intention was to obtain the gravel pit property, owned by Mr. Douglass, by filing and foreclosing a materialmen's lien against the property.  CAGO did in fact file such a lien, and an action to foreclose the lien.  The Court need not decide whether that was Mr. Bourk's true intention.

[9] See Plaintiff's Exh. 15.

people who had bad business dealings with Mr. Slade. Based on those conversations, Officer

Lundy believed Mr. Slade had stolen vehicles and equipment located at the gravel pit. [10]  Mr.

Bourk was aware of the SWAT team raid.

By the end of 2006, following the New Mexico Department of Transportation raid, the

Stoneworks' gravel pit operation was no longer commercially viable. Mr. Slade began to move

towards ceasing operations within the few months after execution of the search warrant.

On January 26, 2007, CAGO took legal action against Mr. Slade, Stoneworks, Ronald

Douglass and JoAnn Douglass by filing a complaint in state court to collect debts owed, for

replevin, and to foreclose a materialmen's lien. On July 11, 2007, the parties settled all claims.

Under the Settlement Agreement, [11] the parties agreed that a stipulated judgment would

be entered against Mr. Slade and Stoneworks and in favor of CAGO in the total amount of

$200,000, and that the judgment would bear interest at the rate of 8.75 % per annum. Mr. Slade

or Stoneworks was to tender $30,000 immediately, and then tender to CAGO either the Trackhoe

or $60,000 from the sale or refinance of the Trackhoe within 30 days after entry of the stipulated

judgment. Such payments would be credited to the amount owing under the stipulated judgment.

If the Trackhoe was surrendered to CAGO, the net proceeds realized by CAGO from its sale of

the Trackohe would be credited to the amount owing under the judgment. The Trackhoe was

estimated to yield $60,000 of net proceeds from a sale. The Settlement Agreement further

provided that CAGO would be paid royalties on product produced from the gravel pit. The

---

[10] Other than Officer Lundy's testimony, CAGO presented no evidence that Mr. Slade had stolen any vehicle or equipment. Ronald Douglass testified that one of the reportedly stolen pieces of equipment was a broken bulldozer which the owner had abandoned at the gravel pit site.

[11] The Settlement Agreement is contained in a transcript made by a court reporter at what was initially intended to be a deposition of Mr. Slade in the case, *Cago, Inc. v. Ronald Douglass, JoAnn Douglass, Curtis Slade, and Stoneworks, LLC,* in the Second Judicial District Court for Bernalillo Country, New Mexico, No. D-202-CV-2007-0085.

royalties paid to CAGO also would be credited to the amount owing under the stipulated judgment.

Mr. Slade's aforementioned legal difficulty regarding bribery of a federal official had resulted in a prison sentence, which he began serving on July 19, 2007, approximately one week after the date of the Settlement Agreement. All parties were aware of this impending sentence when making the Settlement Agreement. Mr. Slade ultimately served a 62-day sentence in the La Tuna Federal Correctional Institution.

Almost three months after the settlement was made, on October 4, 2007, a stipulated judgment (the "Stipulated Judgment") was entered in the state court lawsuit. *See* Exhibit 5. The Stipulated Judgment simply provided for judgment in favor of CAGO and against Slade in the amount of $200,000, with interest accruing at the rate of 8.75% per annum from the date of the judgment (*i.e.* October 4, 2007) until the judgment was paid in full.

Ram Jaquez, an employee of A.S. Horner, was in charge of operation of the gravel pit in Mr. Slade's absence. Mr. Jaquez testified that he believed Mr. Slade was dishonest. Mr. Slade never instructed him either to sell or return the Trackhoe. However, on Mr. Slade's instructions, A.S. Horner paid royalties due under the Settlement Agreement. On October 17, 2007, A.S. Horner tendered $5,225.50 to CAGO "for aggregate removed from the Douglas Pit and or Stoneworks LLC facility from July 9, 2007 through October 3, 2007 [...] at the rate of $0.70 / ton." *See* Exhibit 45. The evidence before the Court is inconclusive as to whether CAGO received any further monies from the sale of product mined at the gravel pit.

Neither Mr. Slade nor Stoneworks ever personally made any of the payments required under the Settlement Agreement, nor did Mr. Slade or Stoneworks ever return the Trackhoe.

***The Trackhoe Disappears and the 2010 Plea Bargain***

Mr. Slade commenced a Chapter 7 bankruptcy case on March 28, 2008, around the same time he was closing out the gravel pit.[12]  Also at some point around that date, the Trackhoe disappeared.

Mr. Slade testified that the last time he saw the Trackhoe was when it was at the Laguna Pueblo in New Mexico.  He testified that he moved it there as part of an agreement with the Laguna Pueblo to remove a railroad spur, which could be sold for scrap.  This testimony was corroborated by Glen Barlow, a close friend and former employee of Mr. Slade and Stoneworks, respectively.   Mr. Slade testified that he intended to use his share of the proceeds from this deal to pay CAGO and that, although he owed many people money, he never owed any money to anyone in or around the Laguna Pueblo.

Ronald Douglass, the owner of the gravel pit property, last saw the Trackhoe in February 2008, when two individuals identifying themselves as being from the Laguna Pueblo took control of it.  He testified that he thought Mr. Slade's son, Shea, attempted to halt their removal of the Trackhoe from the gravel pit, but was unsuccessful.  The two individuals explained to Mr. Douglass that they were taking it because of a "money issue."  Mr. Douglass did not inquire any further into the matter.

A few days after commencing his Chapter 7 bankruptcy case, on or about April 3, 2008, Mr. Slade participated in a telephone call between Plaintiff's counsel, Mr. Bousliman, and Mr. Slade's then-counsel, Mr. Lowe.  In this conversation, Mr. Slade explained where the Trackhoe was to Mr. Lowe, who drew directions on a map of the area that he had obtained from the internet service Mapquest.  Mr. Lowe faxed that map to Mr. Bousliman the same day.  *See* Exhibit 41.  No one involved in the litigation before this Court has seen the Trackhoe since.  A

---

[12] Bankruptcy Case No. 08-10927-j7.

private investigator hired by the Plaintiff, David Martin, spent five hours over three days looking for the Trackhoe in and around the Laguna Pueblo. He used the map drawn by Mr. Lowe at Mr. Slade's direction, but was never able to locate the Trackhoe. The Court finds that the evidence does not establish that Mr. Slade was responsible for the disappearance of the Trackhoe.

At the beginning of May 2008, CAGO made several official demands for Stoneworks to return the Trackhoe to CAGO. *See* Exhibits 16, 17, 18. On September 11, 2008, a Texas grand jury indicted Mr. Slade for theft of services greater than $200,000. In the Statement of Probable Cause attached thereto, a Texas peace officer swore under oath that Mr. Bourk had represented to him that the Trackhoe was valued in excess of $125,000 and that Mr. Slade had caused him to lose rental fees of $250,000 to $300,000. *See* Exhibit 29. On November 22, 2010, Mr. Slade made a plea bargain wherein he agreed to pay $125,000 to Mr. Bourk via monthly payments spread over 10 years. *See* Exhibit 30a. In addition to this restitution and in connection with the plea bargain, Mr. Slade paid $75,000 to Mr. Bourk immediately after the plea bargain was made.

***Damages Claimed***

The present action was filed on May 15, 2008. CAGO claims damages of $632,088.74,[13] but stipulated that Mr. Slade should receive credit for moneys already paid and to be paid to CAGO as restitution or in connection with the plea bargain. CAGO's claim of damages includes $200,000 owed under the Settlement Agreement and Stipulated Judgment; loss of use damages for the period July 11, 2007 (the date of the Settlement Agreement) through October 17, 2011 (the first day of the trial in this adversary proceeding) in the amount of $260,967.74; interest accrued under the Stipulated Judgment in the amount of $76,121.00; legal fees in the amount of $85,000; and costs and expenses in the amount of $5,000.

---

[13] *See* Exhibit 42, a summary exhibit. The $632,088.74 figure exceeds the component damages detailed in Exhibit 42 by $5,000.

## DISCUSSION

CAGO asserts that the debts Mr. Slade owes it are non-dischargeable under §§ 523(a)(2)(A), (a)(2)(B), (a)(4), (a)(6), and (a)(11). CAGO requests the Court to find these debts non-dischargeable due to Mr. Slade's behavior during three time periods: (1) during the formation of the initial Contract; (2) during the time that the parties entered into the Settlement Agreement; and (3) for behavior surrounding the eventual disappearance of the Trackhoe.

Despite submitting numerous claims under subsections of § 523(a), CAGO offered only one – § 523(a)(2)(A) – which supports nondischargeability of Mr. Slade's debt under either the Contract or Settlement Agreement, to CAGO. CAGO's remaining claims under § 523(a) – §§ 523(a)(2)(B), 523(a)(4), 523(a)(6), and § 523(a)(11) – will be denied, either under the facts, well-established case law, or a plain reading of the statute. The Court will address each of CAGO's objections to the discharge of debt.

### 1. Claims under Under 11 U.S.C § 523(a)(2)(A)

CAGO asserts that Mr. Slade made express or implied false representations that induced it to enter into the Contract. CAGO asserts that Mr. Slade made additional false representations that induced it to enter into the Settlement Agreement. CAGO thereby claims that debts under both the Contract and Settlement Agreement are non-dischargeable under 11 U.S.C § 523(a)(2)(A).

The legal standard for establishing non-dischargeability of a debt under 11 U.S.C § 523(a)(2)(A) is:

> A creditor seeking a determination of non-dischargeability under 11 U.S.C. § 523(a)(2)(A) bears the burden of proving, by a preponderance of the evidence, that (1) the debtor made a false representation, (2) the debtor made the representation with the intent to deceive the creditor; (3) the creditor relied on the representation; (4) the creditor's reliance was justifiable; and (5) the debtor's representation caused the creditor to sustain a loss.

*Cabrera v. Larranaga (In re Larranaga)*, 2011 WL 1344562 at *2 (Bankr.D.N.M. J. Jacobvitz), citing *Fowler Bros v. Young (In re Young),* 91 F.3d 1367, 1373 (10th Cir.1996) (the required elements under 11 U.S.C. § 523(a)(2)(A) are: "1) [t]he debtor made a false representation; the debtor made the representation with the intent to deceive the creditor; the creditor relied on the representation; the creditor's reliance was [justifiable]; and the debtor's representation caused the creditor to sustain a loss."); *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d. 351 (1995) (changing the standard of reliance under 11 U.S.C. § 523(a)(2)(A) from "reasonable" to "justifiable.");  *In re Riebesell,* 586 F.3d 782, 789 (10th Cir.2009)(same).

The Court will address first, whether CAGO has established a non-dischargeable claim in connection with events pertaining to the Contract; and second, whether CAGO has established a non-dischargeable claim in connection events pertaining to the Settlement Agreement.  The Court will then address damages.

a.    ***CAGO has established a non-dischargeable claim under § 523(a)(2)(A) in connection events pertaining to the Contract.***

CAGO asserts that Mr. Slade expressly or impliedly misrepresented his intention to make payments pursuant to the terms of the Contract, and that CAGO, acting through Mr. Bourk, in reliance on this misrepresentation, entered into the Contract with Mr. Slade.  CAGO maintains that the debt Mr. Slade owes it under the Contract therefore is non-dischargeable under 11 U.S.C § 523(a)(2)(A).  The Court concludes that CAGO has established a non-dischargeable claim under § 523(a)(2)(A) in connection with events pertaining to the Contract, but also finds that, because the Settlement Agreement constituted a novation, the debt that is non-dischargeable is the debt Mr. Slade owes under the Settlement Agreement, not the debt he owes under the Contract.

### *False Representation and Intent to Deceive*

This Court finds that Mr. Slade made a false representation to Mr. Bourk when Mr. Slade represented that he would pay CAGO the moneys owed under the Contract. Mr. Slade had no intention of making the payments required under the Contract, as represented, when he entered into the Contract.[14]

"False representations are 'representations knowingly and fraudulently made that give rise to the debt.'" *Adams County Dept. of Soc. Services v. Sutherland-Minor (In re Sutherland-Minor)*, 345 B.R. 348, 354 (Bankr.D.Colo.2006), *quoting Cobb v. Lewis (In re Lewis)*, 271 B.R. 877, 885 (10th Cir.B.A.P.2002). A promise to pay a debt made with an intent not to pay is a false representation. *See In re Kountry Korner Store,* 221 B.R. 265, 272 (Bankr.N.D.Okla.1998)("The Court does recognize a species of… fraud in which a promise to perform some act in the future is made without the present intent to ever perform[]).")

Intent to deceive is a question of fact which can be inferred based on the totality of the circumstances. *In re Baines*, 337 B.R. 392, 399 (Bankr.D.N.M.2006), *quoting Young,* 91 F.3d at 1375. Since a debtor-defendant will rarely admit an intent to defraud, fraudulent intent may be inferred from circumstantial evidence. *Young*, 91 F.3d at 1375. The Court examines intent at the inception of the debt, not subsequent misrepresentations after the debt's inception. *Matter of Ethridge*, 80 B.R. 581, 587 (Bankr.M.D.Ga. 1987). A debtor generally cannot overcome an inference of intent to deceive by making an unsupported assertion of honest intent. *See Matter of Van Horne,* 823 F.2d 1285, 1287-88 (8th Cir.1987)(citations omitted), *abrogated on other grounds by Grogan v. Garner*, 498 U.S. 279 (1991).

---

[14] The misrepresentation at issue was Mr. Slade's statement about his *intention* to pay, and *not* a statement about his "financial condition", which would be governed by § 523(a)(2)(B). Mr. Slade's financial condition provides circumstantial evidence about his intentions and knowledge in making such statements, but it was not the basis of his misrepresentation alleged here.

Under the Contract, Stoneworks or Mr. Slade was required to make a security deposit in the amount of $6,000 upon execution of the Contract, and to pay $6,000 per month in rent for twelve months. Mr. Slade represented to Mr. Bourk before the Contract was made that, although neither Stoneworks nor he could currently make the security deposit, Stoneworks had accounts receivable and unencumbered properties from which the payments could be made, that Stoneworks would pay the security deposit in thirty days, and that Stoneworks would have sufficient funds available to make the monthly rental payments.

In fact, neither Stoneworks nor Mr. Slade ever paid the security deposit due under the Contract, nor did Stoneworks or Mr. Slade make a single rental payment. As the principal chartering a new business at the time, Mr. Slade was well aware of the state of his and Stoneworks' finances when Stoneworks and he entered into the Contract. Stoneworks paid various other creditors during the lease term of the Contract, notwithstanding its financial difficulties. The Court does not find credible Mr. Slade's testimony that he intended for Stoneworks and himself to perform their obligations under the Contract. CAGO has satisfied its burden of proving, by a preponderance of the evidence, that when Mr. Slade represented that Stoneworks would pay the security deposit within 30 days after the Contract was made, and would make the rental payments as agreed, Mr. Slade had no intention that Stoneworks or he actually would make those payments as agreed.

There was no reason for Mr. Slade to falsely represent that payments would be made under the Contract, as agreed, other than to deceive CAGO. Mr. Slade needed for Stoneworks to appear "financially reliable" in order to obtain the Trackhoe. Based on these surrounding facts, the Court finds that Mr. Slade intentionally deceived CAGO.

### *Justifiable reliance*

As stated earlier, CAGO must have "justifiably relied" on Mr. Slade's misrepresentation that he or Stoneworks would pay under the Contract in order for the debt to be non-dischargeable under § 523(a)(2)(A). The Court finds that CAGO did so justifiably rely.

The Tenth Circuit Court of Appeals has explained the justifiable reliance requirement of Section § 523(a)(2)(A) as follows:

> [T]he inquiry is whether the actual creditor's reliance was "justifiable" from a subjective standpoint. In determining whether a creditor's reliance was justifiable, a court should therefore examine "the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than [applying] a community standard of conduct to all cases." Even under the "justifiable" test, however, the plaintiff must "use his senses" and at least make "a cursory examination or investigation" of the facts of the transaction before entering into it.

*In re Riebesell*, 586 F.3d 782, 791-92 (10th Cir. 2009)(internal citations omitted). Mr. Bourk was an experienced businessman and former debt collections attorney. At the time of the misrepresentations, Mr. Slade was under criminal charges for attempting to bribe a federal official, a fact of which Mr. Bourk was well aware. Given these red flags, any creditor should have had ample concern, especially one so experienced as Mr. Bourk.

However, Mr. Bourk undertook an investigation that pacified his concerns. He spoke with a bankruptcy trustee in an unrelated case, who gave Mr. Slade a strong recommendation and stated that he believed Mr. Slade had received a raw deal when charged criminally. Mr. Bourk also consulted several other attorneys about Mr. Slade; these attorneys also vouched for Mr. Slade's reliability. Mr. Slade has a powerful personality and is very persuasive. It is not difficult for the Court to believe that Mr. Slade was quite convincing in his representation to Mr. Bourk that Stoneworks or Mr. Slade could and would pay CAGO moneys owed, even if he could not make the down payment on the day the Contract was signed.

-15-

Justifiable reliance is a "less demanding" standard than reasonable reliance. *Field v. Mans*, 516 U.S. at 61. Mr. Bourk performed a more than adequate investigation in light of the red flags that were apparent to him, and was satisfied that Mr. Slade was trustworthy and could be relied upon to fulfill his promises. The Court therefore finds that CAGO justifiably relied on Mr. Slade's representations of payment.

### *Proximate Cause*

Mr. Slade's misrepresentation "must proximately cause the debt for the debt to be excepted from the discharge under 11 U.S.C. § 523(a)(2)(A)." *In re Larranga,* at *6, *citing Hernandez v. Musgrave (In re Musgrave)*, 2011 WL 312883, slip op. at 9 (10th Cir.B.A.P.2011) (unpublished). To satisfy the proximate cause requirement, CAGO must prove two elements: (1) causation in fact, and (2) legal causation. *In re Larranaga,* at *7 (citing authorities). "Causation in fact requires that a debtor's misrepresentations be a 'substantial factor in determining the course of conduct that results in loss.' Legal causation requires that a creditor's loss be reasonably expected to result from the creditor's reliance on the debtor's misrepresentation." *Id.,* citing, among other things, *Restatement (Second) of Torts* §§ 546, 548A.

The Court finds that Mr. Slade's misrepresentations about his intentions to pay the debt incurred under the Contract were the proximate cause of the debts owing by Mr. Slade to CAGO under the Contract and, as the Contract so dictates, under New Mexico law. First, the Court finds causation in fact. Given Mr. Slade's persuasive abilities, this Court finds that Mr. Slade's representations before the Contract was made concerning his intention that Stoneworks or he would perform under the Contract and the expected availability of funds to make payments substantially contributed to Mr. Bourk's decision to lease the Trackhoe to Stoneworks and to work with Stoneworks when payments were not made. Given Mr. Slade's spotty criminal

-16-

history, Mr. Slade's misrepresentations and reassurances were surely a substantial factor influencing CAGO's decision to enter the Contract, and thus were a substantial factor in CAGO's resulting damages.

The Court also finds legal causation. CAGO's loss is of the type that could be reasonably expected to result from CAGO's reliance on the debtor's misrepresentations. Mr. Slade represented that Stoneworks or he would pay as agreed when he in fact did not intend such payment would be made. There is no logical leap required to find that CAGO would be damaged by relying on Mr. Slade's misrepresentation about intention to pay. Quite simply, it can reasonably and obviously be expected that damages would result when someone sells equipment in reliance on a misrepresentation regarding *intent to pay*. Legal causation is present.

As such, all of the enumerated elements for nondischargeability under § 523(a)(2)(A) are present with regard to the debts arising under the Contract.

       b.    ***CAGO did not justifiably rely on any misrepresentations made in connection with the Settlement Agreement.***

The Court next will address CAGO's contention that the Settlement Agreement was induced by fraud. CAGO asserts that Mr. Slade expressly or impliedly misrepresented his intention to make payments pursuant to the terms of the Settlement Agreement, and that CAGO, acting through Mr. Bourk and in his reliance on this misrepresentation, entered into the Settlement Agreement with Mr. Slade. The fourth element of the prima facie case under 11 U.S.C § 523(a)(2)(A) is that the creditor's reliance on the debtor's false representation must be justifiable.[15] Because the Court finds that CAGO did not justifiably rely on any false representations by Mr. Slade when entering into the Settlement Agreement, the Court need not

---

[15] *See Field v. Mans*, 516 U.S. 59, 61, 116 S.Ct. 437, 439 (1995) (determining that, to satisfy the requirements of 11 U.S.C § 523(a)(2)(A), reliance must be "justifiable").

Case 08-01065-j   Doc 77   Filed 03/15/12   Entered 03/15/12 11:45:24 Page 17 of 33

address the other requirements of 11 U.S.C § 523(a)(2)(A) in connection with CAGO's claim of fraud in connection with the Settlement Agreement.

The Settlement Agreement resolved disputes among CAGO, Stoneworks, and Mr. Slade relating to past due payments owing by Stoneworks and Mr. Slade under the Contract. The parties entered into the Settlement Agreement after Mr. Slade had failed, for more than a year and a half, to make a single monthly payment due under the Contract despite Mr. Slade's repeated promises of payment and Mr. Bourk's repeated demands. The only payments Stoneworks or Mr. Slade tendered under the Contract were by checks returned for insufficient funds. Stoneworks did not even pay the security deposit due on execution of the Contract.

Mr. Bourk is a sophisticated businessman and a former debt collections attorney. Before CAGO entered into the Settlement Agreement, Mr. Bourk had investigated the Stonework's financial condition, and was aware of Stonework's financial difficulties and of its history of not paying numerous creditors. Mr. Bourk was also full aware of Stonework's and Mr. Slade's failure to make a single payment to CAGO for a year and a half, dispute repeated demands and repeated promises of payment. Under the Settlement Agreement, which settled CAGO's claims under the Contract, Mr. Slade agreed to pay CAGO $200,000. CAGO entered into the Settlement Agreement knowing full well of the risk that Stoneworks and Mr. Slade would not perform their obligations under the Agreement. This risk was particularly acute, given that Mr. Slade was set to begin a prison sentence approximately one week after the Settlement Agreement was made, a fact of which CAGO was aware.

Under these circumstances, the Court finds that CAGO did not justifiably rely on any express or implied representations by Mr. Slade that he intended to perform his obligations under the Settlement Agreement.

c.        *Only The Debt Owing Under the Settlement Agreement is Non-Dischargeable.*

Although execution of the Settlement Agreement was not induced by fraud, the debt owing by Mr. Slade to CAGO under the Settlement Agreement and Stipulated Judgment, not the debt incurred under the Contract, is the non-dischargeable debt.

The Court finds that the Settlement Agreement and Stipulated Judgment constituted a novation that replaced the rights and obligations of the parties under the Contract. A novation occurs when 1) there is an existing and valid contract; 2) there is an agreement to a new contract by all the parties to the original contract, 3) the new contract is a valid contract; and 4) the new contract extinguishes the old one. *Maulsby v. Magnuson*, 107 N.M. 223, 755 P.2d 67, 70 (1988). In other words, a novation occurs when the parties intend a new contract to replace the original contract. *Hilburn v. Brodhead*, 79 N.M. 460, 444 P.2d 971, 974 (N.M. 1968). The Settlement Agreement provided that a stipulated judgment would be entered against the Stoneworks and Mr. Slade in the amount of $200,000 to resolve all of CAGO's claims under or relating to the Contract. Such settled claims included CAGO's claim of fraud. The Settlement Agreement and Stipulated Judgment replaced the rights and obligations of the parties under the Contract.

As such, since the Settlement Agreement novated the Contract, and the Contract itself was a product of fraud, the debts arising from the Settlement Agreement and the Stipulated Judgment entered pursuant to the settlement are themselves products of the underlying fraud. Thus, even though the settlement agreement itself was not induced by fraud, the fact that it novated a contract predicated on fraud nevertheless renders the settlement debt nondischargeable under 11 U.S.C. § 523(a)(1)(A). *See Archer v. Warner*, 538 U.S. 314, 123 S.Ct. 1462 (2003). In *Archer*, 538 U.S. 314, 123 S.Ct. 1462 (2003), the parties settled a lawsuit under which the Warners would pay the Archers $300,000 and the Archers would release their claims against the

Warners except for claims arising under the settlement agreement. Pursuant to the terms of the settlement agreement, the Warners paid the Archers $200,000 and executed a promissory note in the amount of $100,000. The Archers executed the release. The lawsuit was dismissed with prejudice. The Warners failed to make any payments under the note, and filed a bankruptcy case. 538 U.S. at 317-18, 123 S.Ct. at 1465. The Archers objected under 11 U.S.C. § 523(a)(2)(A) to the dischargeability of their claim for $100,000 on the ground that the debt the parties had settled was procured by fraud. The Supreme Court determined: "[t]he dischargeability provision applies to all debts that 'aris[e] out of' fraud. A debt embodied in the settlement of a fraud case 'arises' ... 'out of' the underlying fraud...." 538 U.S. at 321, 123 S.Ct. at 1466. The Court concluded "that the Archers' settlement agreement and releases may have worked a kind of novation, but that fact does not bar the Archers from showing that the settlement debt arose out of 'false pretenses, a false representation, or actual fraud,' and consequently is nondischargeable [under] 11 U.S.C. § 523(a)(2)(A)." *Id.* Likewise, the debt owing by Mr. Slade to CAGO under the Settlement Agreement and Stipulated Judgment arose out of the fraudulent representations he made that induced CAGO to enter into the Contract. Thus, even though the Settlement Agreement itself was not induced by fraud, the debt represented by the Settlement Agreement constitutes the nondischargeable debt.

d. ***Damages***

CAGO asserts it is entitled to damages in the amount of $632,088.74,[16] consisting of $200,000 owing under the Settlement Agreement and Stipulated Judgment; $76,121.00 of interest accrued under the Stipulated Judgment; $260,967.74 for loss of use of the Trackhoe after the date of the settlement until the date of trial in this adversary proceeding; $85,000 of legal fees; and $5,000 for costs and expenses. *See* Exhibit 42. In the Pretrial Order, CAGO stipulated

---

[16] $632,088.74 exceeds the total of the asserted component damages listed in Exhibit 42 by $5,000.

that Mr. Slade should receive a credit against the non-dischargeable debt for the $75,000 he paid

when the plea bargain was made, and for additional monies he is paid or pays in restitution.

The Court concludes that that amount still owing by Mr. Slade to CAGO under the

Stipulated Judgment is non-dischargeable. Mr. Slade is entitled to credits against the amount

owing under the Stipulated Judgment, as of the dates of payment, for the $75,000 that Mr. Slade

paid to CAGO in November 2010, for all amounts Mr. Slade has paid or pays to CAGO in

connection with the $125,000 restitution award, and for all royalties or other monies paid to

CAGO on product produced from the gravel pit pursuant to the Settlement Agreement. The non-

dischargeable debt includes interest accruing on the unpaid amount owing under the Stipulated

Judgment from October 5, 2007 until the judgment is paid in full.

CAGO is not entitled to damages for loss of use of the Trackhoe after the date of the

settlement in addition to the amounts awarded by the Stipulated Judgment. As discussed above,

because the Settlement Agreement and Stipulated Judgment novated the Contract, CAGO is

entitled to non-dischargeable damages measured by the amount owing under the Settlement

Agreement, not the Contract. The Stipulated Judgment superseded CAGO's claims under the

Contract. The parties valued the Trackhoe at $60,000 under their settlement. The amount of the

Stipulated Judgment includes damages resulting from Mr. Slade's obligation to CAGO resulting

from his failure to return the Trackhoe to CAGO. Therefore, CAGO is not entitled to damages

for loss of use of the Trackhoe after the settlement was reached.

Further, CAGO is not entitled to a damages award to reimburse it for attorneys' fees or

expenses. Neither the Contract nor the Settlement Agreement provide for payment of attorneys'

fees or expenses. In the absence of some statutory or contractual basis for assessment of

attorney's fees arising out of litigation, the American Rule dictates that each party is responsible

for paying its own attorneys' fees, including the prevailing party. *See Alyeska Pipeline Service Co. v. Wilderness Society et al.*, 421 U.S. 240, 95 S.Ct. 1612 (1975) for a discussion of the American Rule. CAGO is not entitled to attorneys' fees or expenses.

### *The Contract Alone Would Have Resulted in a Smaller Nondischargeable Judgment*

The Court notes that if it had awarded CAGO non-dischargeable damages based on breach of the Contract instead damages under the Settlement Agreement, the damage award would have been lower. The Contract provides that it "shall be governed by and construed in accordance with the laws of the State of New Mexico."[17] Under New Mexico law, an agreement styled a lease may be recast as a sale subject to a security interest pursuant to Section 1-203(a) of the Uniform Commercial Code as adopted in New Mexico. N.M. Stat. § 55-1-203(a) (2011). Section 55-1-203(a) provides that "[a] transaction in the form of a lease creates a security interest where: 1) "the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee," and 2) "the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement." Both of these requirements are satisfied here. Mr. Slade and Stoneworks were absolutely obligated to pay CAGO $6,000 monthly for a period of twelve months. There were no provisions allowing for early termination of the Contract. Further, under the Contract the "lessee" has an option to become the owner of the Trackhoe for no additional consideration upon compliance with the agreement.[18] As such, the option to purchase in the Contract *per se* created a security interest in favor of the CAGO.[19]

_____

[17] *See* Exhibit 1.
[18] Paragraph 27 of the Contract so provides:
    OPTION TO PURCHASE: At anytime prior to the end of his lease the Lessee has the option to purchase the equipment if the Lessee has complied with the terms of the lease. *This option may be exercised by the*

If the Court had awarded non-dischargeable damages under the Contract, instead of the Settlement Agreement, damages would have been determined pursuant to Section 2-709(1)(a) of the Uniform Commercial Code, as adopted in New Mexico, based on the unpaid balance of the $70,000 purchase price specified in the Contract. N.M. Stat. § 55-2-709(1)(a).[20] Consequently, had damages been awarded based on the Contract, CAGO would be entitled to significantly less than the $200,000 represented by the Settlement Agreement.

### 2. *Section 523(a)(2)(B) Does Not Support Any Claims for Debts Owed Under the Contract or Settlement Agreement*

CAGO asserts that Mr. Slade owes debts that are non-dischargeable under § 523(a)(2)(B). The section provides that certain debts incurred by use of a false writing relating to the debtor's financial condition upon which the creditor "reasonably relied" are non-dischargeable. 11 U.S.C. § 523(a)(2)(B). Because the Court finds that CAGO has not satisfied the "statement in writing" requirement for establishing a claim under § 523(a)(2)(B), the Court need not consider the other elements of the claim.

*Mr. Slade Never Made of a Statement in Writing Respecting his Financial Condition*

---

*Lessee by giving notice to Lessor in writing that it is exercising this option and paying to the Lessor the sum of $70,000.00 less the total of lease payments made up to the date the purchase price is paid. Lessor shall own the equipment until Lessee exercises the option in writing and pays Lessor the purchase price.* (emphasis added).

[19] *See In re Grubbs Const. Co.*, 319 B.R. 698, 714 (Bankr.M.D.Fla.2005) (when both tests are met, "the agreement is *per se* always a security agreement"); *Kentuckiana Medical Center v. The Leasing Group Pool, II, LLC*, 455 B.R 694, 698-702 (Bankr.S.D.Ind. 2011) ("a transaction is a *per se* security agreement if" both tests are met).

[20] N.M. Stat. § 55-2-709(1)(a) provides:

When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under the next section [N.M. Stat. § 55-2-710], the price[] of goods accepted or of conforming goods lost or damaged within a commercially reasonable time after risk of their loss has passed to the buyer[].

The phrase "statement respecting the debtor's or an insider's financial condition" is used in both sub-sections (A) and (B) of § 523(a)(2) and thus has the same meaning.[21]  The Tenth Circuit Court of Appeals has adopted the "emerging, strict interpretation" of the phrase.  As such, for a debt to be held non-dischargeable under § 523(a)(2)(B) in the Tenth Circuit, it must be predicated upon a false statement in writing that comports with the following definition:

> [S]uch false statements are those that purport to present a picture of the debtor's overall financial health. Statements that present a picture of a debtor's overall financial health include those analogous to balance sheets, income statements, statements of changes in overall financial position, or income and debt statements that present the debtor or insider's net worth, overall financial health, or equation of assets and liabilities. However, such statements need not carry the formality of a balance sheet, income statement, statement of changes in financial position, or income and debt statement. What is important is not the formality of the statement, but the information contained within it — information as to the debtor's or insider's overall net worth or overall income flow.

*Cadwell v. Joelson*, 427 F.3d at 714.

---

[21]  *See Cadwell v. Joelson*, 427 F.3d 700, 704 (10th Cir. 2005).  The Tenth Circuit explains the relevance of this phrase to the interplay of sub-sections (A) and (B) succinctly :

> Specifically, 11 U.S.C. § 523(a)(2)(A) states that a debt obtained by "false pretenses, a false representation, or actual fraud" is not dischargeable. However, § 523(a)(2)(A) contains an exception: If a debt is obtained by a false *oral* "statement respecting the debtor's ... financial condition," the debt is dischargeable. By contrast, 11 U.S.C. § 523(a)(2)(B) states that a debt obtained by a false *written* statement "respecting the debtor's ... financial condition" is *not* dischargeable, provided certain conditions are met.

*Id.*  The Tenth Circuit further explained how any interpretation of the phrase will necessarily have the opposite effect on the scope of each sub-section:

> because § 523(a)(2)(A) provides that a debt obtained by a false oral statement "respecting the debtor's ... financial condition" is dischargeable, and § 523(a)(2)(B) provides that a debt obtained by a false written version of such a statement is not dischargeable, any interpretation of the phrase "respecting the debtor's ... financial condition" will have opposing effects depending on whether the statement was oral or written. If the phrase is broadly construed so that more false oral statements qualify as "respecting the debtor's ... financial condition," more debts will be dischargeable under § 523(a)(2)(A) because that provision allows debts obtained by oral versions of such statements to be discharged — even though debts obtained by other false pretenses, false representations, or actual fraud may not be discharged. By contrast, a broad construction of the phrase "respecting the debtor's ... financial condition," will result in fewer debts obtained based on written versions of such statements to be dischargeable under § 523(a)(2)(B) because that provision bars the discharge of only those false statements that "respect[ ] the debtor's ... financial condition."

*Id.* at 704-05.

-24-

CAGO presented no evidence of any written statements made by Mr. Slade or Stoneworks, prior to the entry of the Contract, regarding overall financial health. Any claim under § 523(a)(2)(B) regarding debts arising from the Contract therefore fails. Likewise, CAGO also presented no such evidence in connection with the Settlement Agreement. There was testimony regarding a list of property Mr. Slade allegedly gave to Mr. Bourk before the settlement was reached, but the list was not admitted into evidence. Even if the list had been admitted, such a written statement does not rise to the level of a "statement respecting the debtor's financial condition." Similarly to the case at hand, the debtor in *Cadwell v. Joelson* also presented the creditor with a list of antique cars she supposedly owned. The Tenth Circuit held that this list did not qualify as a statement respecting her financial decision. Mr. Bourk attempted to obtain financial data from the Stoneworks' computer, but the data was encrypted and unusable. Based on the foregoing, the Court concludes that CAGO is not entitled to any relief under § 523(a)(2)(B) in this case.

### 3. Section 523(a)(4) Does Not Apply Because Mr. Slade Was Not Acting in a Fiduciary Capacity and Did Not Commit Embezzlement or Larceny

CAGO next alleges that its claim against Mr. Slade is non-dischargeable under § 523(a)(4). Under that section, a debt is non-dischargeable if it is a debt for: (1) fraud or defalcation while acting in a fiduciary capacity, (2) embezzlement, or (3) larceny. *See* 11 U.S.C. § 523(a)(4).[22] The Court concludes that CAGO does not have a valid claim under any of these three independent grounds for non-dischargeability of debts under Section 523(a)(4).

### No Fiduciary Relationship Existed Between the Parties

---

[22] In closing argument, Plaintiff's counsel argued that § 523(a)(4) should be interpreted to include a situation where a defendant committed fraud without acting in a fiduciary capacity. This Court directed Plaintiff's counsel to submit a post-trial brief in support of this argument if it wanted the Court to consider it. Plaintiff's counsel did not do so. Therefore, the Court will not consider this argument.

First, there was no fiduciary relationship between Mr. Slade and CAGO of the type that is within the scope of 11 U.S.C. § 523(a)(4). "[A]n express or technical trust must be present for a fiduciary relationship to exist under § 523(a)(4)." *In re Regan*, 477 F.3d 1209, 1211 (10th Cir.2007)(internal quotations and citations omitted). Fiduciary relationships are not created solely by virtue of two parties entering into a "mere contractual relationship." *In re Qin,* 285 B.R. 292, 297 (Bankr.N.D.Iowa.2002), *citing Werner v. Hofman*, 5 F.3d 1170, 1172 (8th Cir. 1993). *See also In re Seeberger*, 2011 WL 6749049, at *17-18; *In re Mullin*, 88 B.R. 454, 456 (Bankr.S.D.Fla.1988).

An express trust is created when parties *expressly* create one.[23]  Neither party presented any evidence of any written or oral statements evincing an intention to create a trust, and neither CAGO nor Mr. Slade ever asserted that they sought to create any sort of relationship that would impress heightened duties. "Neither a general fiduciary duty of confidence, trust, loyalty, and good faith, [], nor an inequality between the parties' knowledge or bargaining power, [], is sufficient to establish a fiduciary relationship for the purposes of dischargeability." *Young*, 91 F.3d at 1371-72 (citations omitted). "Further the fiduciary relationship must be shown to exist prior to the creation of the debt in controversy." *Id., quoting In re Romero,* 535 F.2d 618, 621 (10th Cir. 1976). This Court has been presented with no evidence to support the imposition of

---

[23] New Mexico law on the creation of "express trusts" is long-established. In 1916, the Supreme Court of New Mexico stated that "[e]xpress trusts are those which are created by the direct and positive acts of the parties, by some writing or deed, or will, or by words either expressly or impliedly evincing a desire to create a trustee." *See Ward v. Buchanan*, 22 N.M. 267 (1916). This statement, as a basic principle, has withstood the test of time. *See Tartaglia v. Hodges*, 129 N.M. 497, 509 (N.M.App.2000) ("An express trust is one that is created by the manifest intention of the settlor to create it."); Black's Law Dictionary, trust, (9th ed. 2009) (an express trust is a "trust created with the settlers express intent, usu. Declared in writing; an ordinary trust as opposed to a resulting trust or a constructive trust."). The Tenth Circuit Bankruptcy Appellate Panel has recently enumerated substantially similar requirements: "Express trusts are those trust relationships which are intentionally entered into by the parties. An express trust may involve a formal declaration of trust or a situation where the intention of the parties to form a trust relationship may be inferred by the surrounding facts and circumstances." *In re Sawaged*, 2011 WL 880464, slip op. at *3 (10th Cir.B.A.P.2011).

any heightened duties upon Mr. Slade, and there was no provision for such in the Contract. *See* Exhibit 1. There is no express trust.

The Tenth Circuit has explained when a technical trust exists:

> "A technical trust is distinguished from an express trust in that the intention of the parties is not relevant. In a technical trust, the trust obligations are imposed on the parties. Thus, a technical trust may be determined to exist by virtue of a statutorily imposed duty. However, for a state statute to create a[ …] technical trust for nondischargeability purposes, the statute must define the trust res, establish trustee duties, and impose the trust prior to any wrongdoing creating the obligation.

*In re Sawaged*, slip op. at 3 (internal quotations and citations omitted).

There is no technical trust here. CAGO has not pointed out any statute that would impose upon Mr. Slade the duties of a trustee. Any claim by CAGO that relies on the existence of a fiduciary relationship therefore fails.

### *Mr. Slade Did Not Embezzle the Trackhoe*

CAGO has not proved that Mr. Slade embezzled the Trackhoe. This Court recently addressed what constitutes embezzlement under Section 523(a)(4) in a case involving an alleged embezzlement of funds:

> For purposes of establishing nondischargeability under section 523(a)(4), embezzlement is defined under federal common law as the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come. To establish that the debtor fraudulently appropriated property, the plaintiff must establish that the debtor appropriated the property for a use other than that for which it was entrusted or that the debtor was not lawfully entitled to use the funds for the purposes for which they were in fact used, and the circumstances indicate fraud.

*In re Larranaga,* 2010 WL 3521732, at *6 (Bankr.D.N.M. J. Jacobvitz) (citations omitted). The evidence does not support a finding that Mr. Slade to have fraudulently appropriated any funds realized from a disposition of the Trackhoe.

CAGO has contended or insinuated that Mr. Slade wrongfully sold the Trackhoe and pocketed the proceeds. During closing argument, CAGO'S counsel conceded that the evidence did not support a finding that Mr. Slade had stolen the Trackhoe. The Trackhoe disappeared. The evidence does not establish that Mr. Slade still has the Trackhoe, that the Trackhoe was sold, or that Mr. Slade benefited or profited in connection with the disappearance of the Trackhoe. CAGO has not proven any claim of embezzlement.

### Mr. Slade Did Not Commit Larceny

"Larceny is the 'felonious taking of another's personal property with intent to convert it or deprive the owner of the same. '" *In re Hentges*, 373 B.R. 709, 723 (Bankr.N.D.Okla. 2007), *quoting Bryan v. Lynch (In re Lynch)*, 315 B.R. 173, 179 (Bankr.D.Colo.2004). A "felonious taking" of property requires that such property be taken without the owner's consent. *Id.* "As distinguished from embezzlement, the original taking of the property must be unlawful. For the purposes of section 523(a)(4), a bankruptcy court is not bound by [any] state law definition of larceny but, rather, may follow federal common law[]." *In re Hauck*, 2012 WL 115397, slip op. at 9 (Bankr.D.Colo. 2012). "Larceny requires that the [property] originally come into the Debtor's hands unlawfully." *In re Larranaga,* slip op. at 6 (citations omitted).

Mr. Slade took possession of the Trackhoe from CAGO with its express consent, as evidenced by the Contract. *See* Exhibit 1. Thus CAGO has not proven any claim of larceny.

Based on the foregoing, the Court concludes that CAGO claim of non-dischargeability under 11 U.S.C § 523(a)(4) must be denied.

### 4. The Defendant Did Not Willfully and Maliciously Injure CAGO's Property

CAGO also asserts a claim under 11 U.S.C. § 523(a)(6). That section provides that a debt "for willful and malicious injury by the debtor to another entity or to the property of another

entity" is non-dischargeable. The "willful" and "malicious" prongs are analyzed separately; both are required.[24] In a unanimous opinion, the United States Supreme Court explained the meaing of the "willful and malicious" language contained in Section 523(a)(6), as follows:

> [t]he word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury. […] Moreover, [] the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the *consequences* of an act," not simply "the act itself."

*Kawaauhau v. Geiger,* 523 U.S. 57, 61-62 (1998) (citations omitted, emphasis in original).

The evidence does not establish that Mr. Slade willfully or maliciously injured CAGO's interest in the Trackhoe. As discussed above, although the Trackhoe has disappeared, CAGO has not established that Mr. Slade sold or is responsible for a sale of the Trackhoe, or that Mr. Slade benefited or profited in connection with the disappearance of the Trackhoe.

CAGO's claim of non-dischargeability under 11 U.S.C § 523(a)(6) must be denied.

### 5. *CAGO's Claim of Non-Dischargeability under 11 U.S.C. § 523(a)(11) is Meritless*

Finally, CAGO asserts that the debt Mr. Slade owes to CAGO is non-dischargeable under § 523(a)(11). Section 523(a)(11) is plainly inapplicable to this case.

---

[24] The Tenth Circuit Court of Appeals has counseled against "overlook[ing] the criticality of the terms "willful" act and "malicious injury" in § 523(a)(6). Without proof of *both,* an objection to the discharge of a debt under that section must fail. For example, in *Mitsubishi Motors Credit of America, Inc. v. Longley (In re Longley),* 235 B.R. 651, 657 (10th Cir. BAP 1999), the court held, to constitute a willful act under § 523(a)(6), the debtor must 'desire ... [to cause] the consequences of his act or ... believe [that] the consequences are substantially certain to result from it.' *Id.* at 657 (quoting Restatement (Second) of Torts, § 8A (1965)). Also, in *Hope v. Walker (In re Walker),* 48 F.3d 1161, 1164 (11th Cir.1995), the court concluded the term "malicious" requires proof "that the debtor either intend the resulting injury or intentionally take action that is substantially certain to cause the injury." *See also Markowitz v. Campbell (In re Markowitz),* 190 F.3d 455, 462-63 (6th Cir.1999) (nondischargeability under § 523(a)(6) requires proof of an intent to do harm, not just an intentional act). *In re Moore,* 357 F.3d 1125, 1129 (10th Cir.2004).

Section 523(a)(11) provides:

(a) A discharge under section 727… of this title does not discharge an individual debtor from any debt - (11) provided in any final judgment, unreviewable order, or consent order or decree entered in any court of the United States or of any State, issued by a Federal depository institutions [*sic*] regulatory agency, *or* contained in any settlement agreement entered into by the debtor, arising from any act of fraud or defalcation *while acting in a fiduciary capacity committed with respect to any depository institution or insured credit union.*

11 U.S.C. § 523(a)(11) (emphasis added).

It is a cardinal canon of statutory interpretation that a court must begin with the statutory language. "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what is says there. When the words of a statute are unambiguous, then this first canon is also the last: judicial inquiry is complete."[25] The language of § 523(a)(11) is not reasonably open to more than one interpretation, at least insofar as it applies to this case, and therefore, it is statutorily impossible to find a nondischargeable debt under this section.

There are many commas and coordinating grammatical conjunctions ("or") contained in sub-section 523(a)(11). Absent a careful reading, § 523(a)(11) could be misconstrued to mean that any settlement agreement entered by a court would be nondischargeable. However, this construction is incorrect.

This first part of § 523(a)(11) states that a discharge provided by § 727 does not apply to any debt "provided in a final judgment, unreviewable order, or consent order or decree entered in

---

[25] *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253-54, 112 S.Ct. 1146 (1992), citing *United States* v. *Ron Pair Enterprises, Inc.,* 489 U. S. 235, 241-242 (1989); *United States* v. *Goldenberg,* 168 U. S. 95, 102-103 (1897); *Oneale* v. *Thornton,* 6 Cranch 53, 68 (1810), *Rubin* v. *United States,* 449 U. S. 424, 430 (1981) (when a statute is unambiguous, this first canon is also the last as "judicial inquiry is complete"). There are limited exceptions to this canon of statutory construction. *See, e.g. Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 575 (1982) ("It is true that interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."); *In re Kane,* 336 B.R. 477, 485-489 (discusses the courts' ability to correct a "scrivener's error," i.e. rewrite what it believes to be an incorrectly written law). However, such exceptions do not apply here.

any court of the United States or of any State, issued by a Federal depository institutions regulatory agency, or contained in any settlement agreement entered into by the debtor, arising from any act of fraud or defalcation…." The second part of the sub-section modifies the first part. The word "while" introduces a mandatory condition to the first part: The debtor must have committed the fraud or defalcation "*while* acting in a fiduciary capacity committed with respect to any depository institution or insured credit union." (emphasis added). This condition is not satisfied under the facts present in this case. Even if the first part were satisfied here, and the Court does not make that finding, CAGO has not presented evidence that would satisfy the second part.

"Depository institution" and "insured credit union" are terms of art under the Bankruptcy Code. Although the Code does not provide "depository institution" its own definitional subsection in 11 U.S.C. § 101 "Definitions" ("§ 101"), § 101(12A)(D) *does* define the term by reference to section 3 of the Federal Deposit Insurance Act (the "FDIA"). The FDIA defines a depository institution as "any bank or savings association". *See* 12 U.S.C. § 1813(c)(1). CAGO is not a bank or savings association; it is a privately held corporation that, among other things, sells and leases heavy equipment to others.

Bankruptcy Code § 101(34) states that the term "insured credit union' has the meaning given it in section 101(7) of the Federal Credit Union Act (the "FCUA"). The FCUA states that 'the term 'insured credit union' means any credit union the member accounts of which are insured in accordance with the provisions of subchapter II of this chapter…." *See* 12 U.S.C. § 1752(7). CAGO does not claim to be chartered as a credit union under state or federal law.

Because CAGO is neither a "depository institution" nor an "insured credit union", §

Case 08-01065-j   Doc 77   Filed 03/15/12   Entered 03/15/12 11:45:24 Page 31 of 33

523(a)(11) is inapplicable.[26]  Consequently, CAGO's claim of non-dischargeability under that section must be denied.

## CONCLUSION

Mr. Slade made a false representation to CAGO in connection with the Contract that supports a claim for nondischargeability under 11 U.S.C. § 523(a)(2)(A).  The amount of the nondischargeable debt is measured by the debt Mr. Slade owes under the Settlement Agreement and Stipulated Judgment, after crediting the $75,000 that Mr. Slade paid to CAGO in November 2010, all amounts Mr. Slade has paid or pays to CAGO in connection with the $125,000 restitution award, and all royalties or other monies paid to CAGO on product produced from the gravel pit pursuant to the Settlement Agreement.  The non-dischargeable debt includes interest accruing on the unpaid amount owing under the Stipulated Judgment from October 5, 2007 until the judgment is paid in full.  All other claims for nondischargeability of debt fail.  A judgment consistent with this Memorandum Opinion will be entered.

_____
Robert H. Jacobvitz
UNITED STATES BANKRUPTCY JUDGE

Date entered on docket:  3/15/12

COPY TO:

Jason C Bousliman
Attorney for Plaintiff
PO Box 2168
Albuquerque, NM 87103-2168

---

[26] Such a plain and straightforward reading comports with the legislative history of § 523(a)(11), which was enacted along with 11 U.S.C. § 523(a)(12) as part of the banking law enforcement provisions in the Crime Control Act of 1990, Pub. L. 101-647, 104 Stat. 4789.  These sub-sections were narrowly drafted to affect insiders within bank and thrift institutions who were involved in wrongful acts that jeopardized the financial health of their institutions.  *See* 3 William L. Norton, Jr., Norton Bankr. L. & Prac. 3d § 57:59 (October 2011).

Raymond Curtis Slade
*Pro se*
7225 Gun Club SW
Albuquerque, NM 87121